CURTIS, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

and

Story, Inc., Intervening Respondent.

No. 80–1485.

United States Court of Appeals,
Tenth Circuit.

Submitted Sept. 28, 1981.

Decided Nov. 2, 1981.

Lavern R. Holdeman, Peterson, Bowman & Johanns, Lincoln, Neb., for petitioner.

Richard A. Allen, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, and Robert J. Grady, Washington, D. C., for respondent I.C.C.

Sanford M. Litvack, Asst. Gen. Counsel, and Robert B. Nicholson and Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., for respondent United States.

George M. Boles, Carlton, Boles, Clark, Vann, Stichweh & Caddis, Birmingham, Ala., for intervening respondent Story, Inc.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Curtis, Inc. here seeks review of an order of the Interstate Commerce Commission which granted operating authority to respondent Story, Inc. Curtis is challenging the Commission's determination pursuant to 49 U.S.C. § 10922(a), that Story was fit to provide the authorized transportation services. Curtis seeks a reversal of the Commission's decision.

## I.

### PRELIMINARY DISCUSSION

Story, Inc. is almost wholly owned by and is entirely operated under the aegis of Harold David Story, who has done business in the trucking owning and leasing industry since 1970. By an application filed July 7, 1978, Story sought his first interstate motor common carrier permanent operating authority. He proposed that the company be allowed to transport carpeting from certain points in Georgia to points in California, Oregon, Washington, Idaho, Wyoming, Montana, Utah and Arizona. The statute provides that the Commission issues certificates to authorized persons to provide transportation as a motor common carrier if the Commission finds (1) that such persons are fit, willing and able [a] to provide the transportation to be authorized by the certificate, and [b] to comply with applicable statutory provisions and regulations of the Commission; and (2) that transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

There is little question about the public need for the proposed service. It is the evidence that has to do with Story's fitness to receive the operating authority that is in dispute before us. The fitness inquiry addresses itself to the personal and financial integrity of Story, the applicant's present and principal shareholder. The evidence shows that he was 35 years of age at that time, and had been in the transportation business since 1960. He was drafted during this period to serve in the Vietnam war, and he began anew two years later. At the time of the application, Story owned sixty-seven sleeper-cab trailers and one hundred forty-five foot refrigerated trailers, 20% of them outright and the balance financed.

The data which he offered at the hearing were somewhat sketchy and unaudited, and were attended with a good many reservations and explanations from the accountants. The data consisted of Story's balance sheet and income statements and also those of Story, Inc. for the year ending December 31, 1977, more than 14 months before the hearing. Mr. Story indicated that the company's cash situation was not accurately reflected by the data, and admitted, regarding his own liabilities, that he now owed more than $100,000 to the Bank of Rainsville, rather than the $41,000 figure shown on the balance sheet. The figure cited as Mr. Story's net worth, $1,219,000 as of December 31, 1977, admittedly was contingent upon the receipt of $1,000,000 allegedly owed him by an agricultural cooperative with which he had engaged in many transactions, some of which were questionable.

Mr. Story's involvement with this cooperative, the Sand Mountain Farmers' Cooperative, is really the stumbling block in this inquiry. It was organized in 1975 by Story, and he invested some $380,000 in it and became the salaried president and general manager. Sand Mountain was an unregulated agricultural cooperative. It was required by a former statute, 49 U.S.C. § 10526(a)(5)(A)(ii), to transport commodities at least 85% of which were exempt from regulation under the Interstate Commerce Act. In addition, Sand Mountain could lawfully transport no more than 50% of its gross traffic for non-members of the cooperative, under former § 10526(a)(5)(B). Testimony at the hearing indicated, however, that in the words of the Administrative Law Judge, "Mr. Story found it difficult to meet carpet shipper equipment demands while at the same time meeting the legal criteria pertaining to the amount of regulated traffic an agricultural cooperative may legitimately handle."

Sand Mountain was audited at least twice in three years by the I.C.C. Although no

citations were issued, both the I.C.C.'s accountants and the cooperative's attorney advised Story to abandon his "different" interpretation of the § 10526(a)(5) rules and adopt theirs. Story admitted at the hearing that his interpretation of § 10526(a)(5) was "my version of it." He maintained that he was still not sure as to the legal requirements of the statute.

These indications that regulated and exempt freight may have been transported in violation of applicable regulations were not the only evidence of disregard of the law. Other evidence established that the cooperative had been mismanaged. Mr. Story and members of his family were the directors of the cooperative from its inception. The participation of members of the cooperative was minimal. They contributed an initial fee of $5.00 to $10.00 which was often waived. The cooperative never operated at a profit for its members. The profits were realized by Mr. Story. At the time of the hearing the cooperative owed him about $1,000,000 worth in delayed payments on equipment leases; about $600,000 was actually collectible at the time of the hearing.

The evidence established that Story, Inc. and the Sand Mountain Cooperative were treated by Story as a single entity. Trailers owned by Mr. Story were used as offices by the cooperative free of charge. While Story, Inc. was operating under temporary emergency authority, its equipment was juggled between the two entities so as to handle both regulated loads and exempt loads brokered by the cooperative. In some instances the name "Story, Inc." had been typed over the name "Sand Mountain" on bills of lading. Story testified that if his application was granted the equipment belonging to him would be pulled from the cooperative and transferred to Story, Inc. He also stated that most of the independent owner-operators who were driving for the cooperative would transfer their leases to Story, Inc.

### A. The Decision of the Administrative Law Judge

The Administrative Law Judge recommended that limited-term operating authority should be granted to Story, Inc. The Administrative Law Judge pointed to the substantial evidence of public need for the proposed services. He also confesses, however, that he had considerable doubt as to the applicant's fitness. The Judge noted in particular that: "* * * [the evidence regarding] applicant's willingness to abide by the law * * * must cause one to hesitate." Story, Inc.'s financial data "were almost insultingly meagre [sic] and of doubtful quality, * * *." In addition, the Administrative Law Judge continued, "there was not the slightest sign of contrition by Mr. Story for his past illegality in setting up a sham agricultural cooperative * * *." Furthermore, the Administrative Law Judge stated, Mr. Story's "adherence to self-serving, twisted interpretations of the law * * can only be described as brazen."[1] Nevertheless, he concluded, "Mr. Story's youth, his background in the jungle of exempt hauling and his performance of duty to his country * * * at a time when others better placed than he scoffed at duty, leads [sic] one to hope." The Judge's decision to grant a conditional three-year certificate stemmed from his concern about the applicant's fitness. He said, "Any interim disobedience of the law, however slight, should be viewed as a resumption of lawlessness in the applicant * * *."

### B. Affirmance by the Commission

Division 2 of the Interstate Commerce Commission rejected part of the Administrative Law Judge's reasoning but affirmed his decision. The three Commissioners found the factors of Mr. Story's youth and background, and his Vietnam War record to be irrelevant to determining fitness. They concluded, nevertheless, that the grant of a limited-term certificate was proper. Nei-

1. The Administrative Law Judge added that he was forwarding the transcript of the hearing to the I.C.C.'s Bureau of Investigations and Enforcement with the recommendation that all violations of transportation and securities law by Story, Inc. and Sand Mountain be investigated and prosecuted.

ther Mr. Story nor the Sand Mountain Cooperative had actually been cited for any violations of law, and any doubts raised by the inconclusive evidence adduced at the hearing should, they felt, be resolved in the applicant's favor. Finally, the Commissioners noted, the imposition of a three-year limitation on the certificate would ensure that Story's conduct and financial status would remain subject to close scrutiny.

## II.

### STANDARD OF REVIEW

 Interstate Commerce Commission decisions are presumptively valid. *Midwestern Transportation, Inc. v. Interstate Commerce Commission*, 635 F.2d 771, 774 (10th Cir. 1980) quoting *Interstate Commerce Commission v. City of Jersey City*, 322 U.S. 503, 512–513, 64 S.Ct. 1129, 1133–1134, 88 L.Ed. 1420 (1944). Judicial review is narrow in scope. This court's review is restricted to determining whether the Commission's decision is supported by substantial evidence, and to ensuring that the decision is not arbitrary, capricious or otherwise an abuse of discretion. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284–285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1975).

 "Substantial evidence" constituting "more than a mere scintilla" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a [factual] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Id.*

 Under the "arbitrary and capricious" standard, "the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc.*

*v. Arkansas-Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The Commission must articulate a rational connection between the facts found and the choice made. *Id.* A decision of less than ideal clarity may be upheld if the Commission's path may be reasonably discerned, but the court may not supply a reasoned basis for the agency's action that the agency itself has not given. *Id.* (Quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) and *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)).

Based on these guidelines we conclude that the decision must be reversed.

## III.

### THE FITNESS DETERMINATION

██ Before issuing a certificate of public convenience and necessity the Commission must find, in addition to public need, that the applicant is fit, willing and able to provide the transportation services authorized and to comply with the Interstate Commerce Act and regulations of the Commission. 49 U.S.C. § 10922(a), Act of October 17, 1978 (since revised). That "fitness" determination encompasses three factors: (a) the applicant's financial ability to perform the service it seeks to provide; (b) its capability to properly and safely perform the proposed service, and (c) its willingness to comply with the Interstate Commerce Act and regulations promulgated thereunder. Eagle Motor Lines, Inc., Investigation and Revocation of Certificates, 117 M.C.C. 30, 35 (1972).

██ Fitness is an independent inquiry that cannot be influenced or altered by any corresponding showing of public need for the applicant's service. Pulaski Highway Express, Inc., Extension—Elkton, Kentucky, 130 M.C.C. 147, 151 (1978); Watkins Motor Lines, Inc., Extension—To Four States, 120 M.C.C. 92, 101 (1974); Metler Hauling & Rigging, Extension—Loudon County, Tennessee, 117 M.C.C. 557, 559–560 (1972). Thus, the uncontroverted evidence

of public need for improved service cannot and does not offset a conclusion of unfitness.

■ The applicant has the burden of producing affirmative proof of fitness. *St. Johnsbury Trucking Co. v. United States,* 326 F.Supp. 938, 940 (D.Vt. 1971); Speedway Carriers, Inc., Extension—Pesticides, 128 M.C.C. 60, 65–66 (1977); Pulaski Highway Express, Inc., Extension—Elkton, Kentucky, 126 M.C.C. 382, 390 (1977); Watkins Motor Lines, Extension—To Four States, 120 M.C.C. 92, 101 (1974). The reviewing court, therefore, must ensure the presence of evidence in support of the Commission's conclusion that the applicant had sustained its burden.

There is no dispute in this case about Story, Inc.'s operational fitness. Story plainly has the equipment necessary to perform the proposed service. Hence, only the determinations regarding Story's financial fitness and its willingness to comply with applicable regulations need be considered here.

A. *Financial Fitness*

Is the applicant shown to have sufficient resources to provide the proposed services? This determines its financial fitness. Milne Truck Lines, Inc., Extension—San Francisco, 121 M.C.C. 149, 166 (1975).

The Commission has described the financial data submitted by applicant as "old" and "sketchy." The indication is that the information does not presently reflect the applicant's financial situation. The Administrative Law Judge also expressed *his* doubts about Story's financial information, but concluded that "given Mr. Story's past operational record, and operating as he does in a field where owner-operators predominate, the applicant would in all probability be found financailly [sic] fit if Mr. Story had no money at all."

Although inconsistent conclusions could be drawn from the evidence submitted at the hearing, it is inappropriate to disturb the Commission's finding of financial fitness here. Some evidence supports the Commission determination. Story, Inc. apparently showed a net profit of $148,000 and retained earnings of about $47,000 for the year 1977. Likewise, Mr. Story appeared to be in a sound financial position, having a net worth of more than $1,000,000. The precise amounts in each instance are disputed, but the evidence supports a conclusion that the applicant could muster sufficient monetary resources to provide the proposed service.

■ The weighing of evidence and the drawing of inferences therefrom are tasks which are for the Commission. *Cf. Ralston Purina Co. v. Louisville & Nashville R. R. Co.,* 426 U.S. 476, 477–78, 96 S.Ct. 2160, 2161, 48 L.Ed.2d 781 (1976); *United States v. Detroit Navigation Co.,* 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945). Accordingly, it is concluded that the Commission's finding of Story's financial fitness was supported by substantial evidence and should stand.

B. *Willingness to Comply with Applicable Law*

The Commission's finding that the applicant would comply with applicable law is not supported by the evidence. Indeed, the Commission's decision was an arbitrary and capricious one.

1. *"Substantial Evidence" Review*

Much of the evidence adduced at the hearing and discussed above suggests that Mr. Story occasionally violated—at times even flaunted—the statutes and regulations applicable to the operations of Story, Inc. and the Sand Mountain Farmers Cooperative. That evidence of past disregard for law raised in turn the reasonable inference that Story would likely continue to violate the law. The Commission's decision to reject that inference might have been comprehensible had *some* evidence indicated that Mr. Story intended to comply with the law in the future. No such evidence appears, however.

Indeed, the Commission specifically rejected the factors cited by the Administrative Law Judge as the *only* evidence stand-

ing in contraposition to the adverse fitness evidence. These factors were Story's youth, background and war record. No other evidence opposed the adverse ·evidence.

■ The Commission predicated its finding that the applicant was fit on the assertion that neither Story, Inc. nor Sand Mountain had ever been actually cited for violation of law. This, however, cannot serve as a sound basis for the grant of a certificate. Story, Inc., of course, had the burden of proving its fitness. The absence of certain proof of unfitness does not serve to prove fitness. The applicant must produce something besides nonexistence of prior disciplinary proceedings to affirmatively demonstrate the likelihood of future adherence to the law.

The Commission has recognized the above principle in other factually similar cases. Speedway Carriers, Inc., Extension—Pesticides, 128 M.C.C. 60 (1977), is a relevant authority. There the applicant's principal had been associated with an agricultural cooperative engaged in questionable operations. The Commission observed:

> Applicant's position on the fitness issue is that absent proof of violations of the § 203(b)(5) [agricultural cooperative] exemption by [certain cooperatives], Mr. Anderson's [the principal's] association with these firms should not bar a grant of authority to Speedway. That position disregards the fact that in application cases it is the applicant who bears ·the burden of proving its fitness to conduct the operation as proposed * * * Mr. Anderson has not chosen to provide affirmative evidence of his fitness to conduct the proposed operations. Instead, he has concentrated on fending off the [Bureau of Investigations and Enforcement's] allegations and contented himself with the conclusion that the Bureau's evidence does not conclusively establish that he has violated the law. * * *. We freely acknowledge that the Bureau may not have presented sufficient evidence to secure Mr. Anderson's conviction in a criminal trial. However, the Bureau presented

evidence which casts a shadow on Mr. Anderson's business. * * * Mr. Anderson's conduct and lack of candor preclude a finding that applicant is willing and able to conduct its future operations in a lawful manner.

128 M.C.C. at 65–66.

The *Speedway Carriers* case admittedly does not disclose facts identical to those of the instant case. In *Speedway Carriers*, the agricultural cooperative which was considered had no members or demonstrated traffic; in addition, the cooperative consistently refused to produce transportation records to document its compliance with applicable requirements. It openly defied the Commission. Nevertheless, that case's discussion of the applicant's failure to sustain its burden of proof is wholly applicable to this case as well.

■ In conclusion, no substantial evidence supports the Commission's decision on the question before us. Virtually all of the evidence leads to the conclusion that the applicant was unwilling to comply with applicable law.

### 2. *"Arbitrary and Capricious" Test*

As we indicated above, the decision should also be invalidated under the arbitrary and capricious standard of review. See *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). The Commission not only failed to cite *sufficient* evidence for its decision, but committed a clear error of judgment by disregarding substantial *contrary* evidence and ignoring relevant legal criteria.

■ In evaluating an applicant's willingness to obey the law, the Commission was required to consider five specific factors if past violations appear on the record. Those factors are:

> (1) The nature and extent of * * * [the carrier's] past violations, (2) the mitigating or extenuating circumstances surrounding the violations, (3) whether the carrier's conduct represents a flagrant and persistent disregard of [the] Commis-

sion's rules and regulations, (4) whether it has made sincere efforts to correct its past mistakes, and (5) whether applicant is willing and able to comport in the future with the statute and the applicable rules and regulations thereunder.

Associated Transport, Inc., Extension—TVA Plant, 125 M.C.C. 69, 73 (1976); Distributors Service Co., Extension—Foods, 118 M.C.C. 322, 329 (1973).

■ The Administrative Law Judge cited this five-part test in his opinion, but did not include separate findings for each of the factors. The Commission made no mention of the five factors; it simply asserted that the applicant had never been *cited* for any violations, implying that the test was inapplicable to this case. Dec. Div. 2 at 1.

In support of its contention that the five-part test must be applied here to preclude a finding of fitness, petitioner Curtis cites Pulaski Highway Express, Inc., Extension—Elkton, 126 M.C.C. 382 (1977), rev'd. 130 M.C.C. 147 (1978). In that case the full Commission concluded that an applicant who had engaged in numerous past violations was unfit to receive the requested authority. The Commission utilized the five-part test to evaluate the applicant's fitness, and noted in its first decision that "[i]n an application proceeding * * * the applicant bears the burden of establishing its fitness *irrespective of whether the Bureau of Investigations and Enforcement participates in that proceeding.*" 126 M.C.C. at 390 (emphasis added; citation omitted). The implication of this language, petitioner argues, is that alleged violations need not have been actually confirmed by a regulatory or adjudicative body before a searching fitness inquiry is required.

The Commission contends that the five-part test is inappropriately applied where no actual violations have been shown. Brief for Petitioner at 18–19. It distinguishes the *Pulaski* case, noting that at least one of the violations found significant there had been conclusively established in a federal district court prior to the filing of the application. *See* 130 M.C.C. at 153.

Although no clear formulation of the principle which is urged by petitioner is to be found in the law, it is appropriate to conclude that Mr. Story and Sand Mountain's conduct amounted to "past violations" for purposes of the five-part test. That interpretation accords with related pronouncements by the Commission, such as its statement in Transamerican Freight Lines, Inc., Extension—Columbus, Georgia, 131 M.C.C. 640 (1979), that "the existence of a criminal conviction or other court action is not a prerequisite to our considering, and giving appropriate weight to, evidence of unlawful conduct." *Id.* at 643 (citations omitted). *See also* Berger Common Carrier Application, 119 M.C.C. 894, 896–898 (1974) (applicant found unfit because insufficient evidence of willingness to comply with laws; three warning letters about applicant's prior illegal operations had been sent by I.C.C., but no other enforcement attempted). *Compare* Roesch Lines, Inc., Extension of Charter Operations, 131 M.C.C. 722, 732 (1979) (unauthorized operations attributable to applicant's erroneous interpretations of applicable law and regulations not indicative of unfitness).

Thus the Commission should have applied the five-part test. To the extent that it failed to do so, the decision it reached ignored highly relevant standards, and is based on matters outside the statute. Furthermore, to the extent that some of the five-factor analysis inadvertently entered into the decision but the ultimate finding was that the applicant was fit, the decision constituted an error of judgment, and was, indeed, an arbitrary one. As noted above, the Administrative Law Judge did consider some of the five factors. His determination with respect to the "nature and extent of past violations" was that the applicant was guilty of "past illegality in setting up a sham agricultural cooperative" and that the applicant used "self-serving, twisted interpretations of the law * * * in the teeth of contrary advice from counsel and Commission auditors." Regarding extenuating circumstances, efforts to correct past mistakes, and whether the applicant's conduct manifested "flagrant disregard," the Ad-

ministrative Law Judge had noted that "there was not the slightest sign of contrition by Mr. Story for his past illegality," and added that Mr. Story's conduct could "only be described as brazen."

 Past violations of Commission rules and regulations are only one element to be considered in determining the applicant's present and future fitness for the requested certificate, *Crete Carrier Corp. v. United States*, 577 F.2d 49, 51 (8th Cir. 1978); but the Commission's decision to effectively disregard the Administrative Law Judge's findings altogether even while commending his reservations as "well-taken" seemingly was an abuse of discretion. In consequence the Commission's decision that Story, Inc. is fit should be reversed.

## IV.

### THE GRANT OF A LIMITED–TERM CERTIFICATE

 Because the applicant was unfit to receive a grant of permanent operating authority, it was also unfit to receive the limited-term certificate actually granted by the Commission.

A certificate limited to a term of years is occasionally granted by the Commission in cases that allow a finding of conditional fitness despite some evidence indicating unfitness. *See e.g.*, Radke Extension—Various Commodities, 113 M.C.C. 89, 96 (1971); Jameson Contract Carrier Application, 110 M.C.C. 469, 473 (1969). Limited-term authority must be distinguished from temporary or emergency temporary authority; the former requires findings of fitness and public need, while the latter types are issued pursuant to statute in response to urgent transportation needs. *See REA Express, Inc. v. United States*, 568 F.2d 940, 951 (2nd Cir. 1977).

No case appears in which a limited-term certificate was issued despite a finding of unfitness. Instead, the Commission often rejects outright applications that disclose serious violations. In White Tiger Transportation Co., Extension—General Commodities Between New Jersey and the

United States, No. MC–143236 (Sub. No. 11) (1980), for example, the Commission concluded that "[a] review of applicant's dismal compliance record leads us to believe that [the granting of a limited term certificate] * * * would not be likely to deter further unlawful activities or be sufficient incentive for applicant to abide by the Act and the Commission's regulations." *Id.* at 4 (citation omitted.)

The past violations that appear in decisions refusing limited-term authority are often more severe than those evident in this case. *See, e.g.*, White Tiger, *supra* (violations included misrepresentation of size of fleet, operations without or beyond the scope of authority, disregard of safety regulations, failure to disclose common control affiliations, attempts to conceal information, forged notary signatures, and false testimony); Pulaski Highway Express, Inc., Extension—Elkton, 130 M.C.C. 147 (1970) (violations included delinquent c.o.d. remittances documented in a federal criminal action, refusal to pay loss and damage claims, operations beyond authorization, and excessive entertainment expenditures). Significant mitigating circumstances such as sincere remedial efforts, however, appear in cases in which limited-term authority *is* granted. *See, e.g.*, Sullivan's Motor Delivery, Inc., Extension—Small Shipments, 123 M.C.C. 559 (1975) (unauthorized operations had been discontinued since one year before hearing; applicant's president now "has tighter rein on" the actions of employees); Mountain Pacific Trucking Corp., Extension —Montana, 119 M.C.C. 247 (1973) (violations not part of "conscious design"; errors made in good faith); Radke Extension—Various Commodities, 113 M.C.C. 88 (1971) (sincere effort to correct past mistakes and effect compliance disclosed by evidence); Spector Freight System, Inc., Extension—Whitley County, Indiana, 111 M.C.C. 889 (1970) (service failures had been corrected; Johnny Brown's, Inc., Extension—Winchester, Virginia, 111 M.C.C. 905 (1970) (violations were committed unintentionally or because of ignorance; corrective measures including installation of more modern dis-

patch communications system, replacement of obsolete bookkeeping system, and requirement of driver check sheets, had been implemented); Jameson Contract Carrier Application, 110 M.C.C. 469 (1969) (violations were prompted by shippers rather than by applicant, and could not be classified as persistent or longstanding). No such mitigating circumstances or evidence of corrective action appear in the instant case.

Our final conclusion is that it was error, in view of the record with respect to fitness, to issue even a limited-term certificate. However, time has passed and this may provide an opportunity for the Commission to ascertain whether the applicant's fitness has changed for the better.

We remand the case to the Commission for this limited inquiry only: that is to say, for the purpose of considering present fitness. No authority is to be granted, however, unless positive evidence is brought forward which demonstrates convincingly that a drastic improvement has taken place whereby the applicant demonstrates firm commitment to compliance with the law, not only present but in the future as well.