**BOSTON CARRIER, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

**No. 82–2140.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 19, 1983.

Decided Oct. 30, 1984.

Robert K. Goren, Philadelphia, Pa., for petitioner.

Robert J. Grady, Atty., I.C.C., Washington, D.C., with whom Robert S. Burk, Acting Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Robert B. Nicholson and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Henri F.

Rush, Associate Gen. Counsel, I.C.C., Washington, D.C., also entered an appearance for respondents.

Before WILKEY, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Petitioner Boston Carrier, Inc. ("BC") asks us to review and set aside a decision of the Interstate Commerce Commission denying BC's application for motor common carrier authority. For the reasons set out below, we affirm the Commission.

## I.

By application dated October 12, 1980, BC sought from the Interstate Commerce Commission a grant of authority to transport general commodities from points in Rhode Island to other points in the United States. The application met with protests from two motor carriers, Del Transport, Inc. ("Del"),[1] and Coastal Tank Lines, Inc., and from two former employees of BC, Kathleen M. Larrabee and Colette A. Bedel.

The matter came before the Commission's Review Board Number 1, and on February 1, 1982, that Board decided "that there is a question whether applicant is fit, willing, or able properly to perform the service proposed and to conform to the provisions of the Act and the Commission's requirements, rules and regulations thereunder ...." J.A. at 11. The Review Board ordered an oral hearing on the application and provided the Commission's Office of Compliance and Consumer Assistance with a copy of the decision "so that it can evaluate whether to participate in this matter." *Id.* at 12. The hearing was

scheduled to begin on March 16, 1982, at Providence, Rhode Island.

On March 3, 1982, a three-member panel of the Commission, Division 1, issued a decision outlining the issues to be addressed at the March 16 hearing. That decision stated in part:

> In their verified statements protestants Larrabee and Bedel contend, among other things, that applicant has been conducting interstate property transportation without the requisite authority from this Commission; that it has been engaging in fraudulent practices relative to the Commission's fuel surcharge program; and that it may knowingly have submitted false information to the Commission and otherwise unlawfully interfered with Commission investigation of its operations. Although applicant denies the allegations, it appears that questions exist concerning applicant's fitness....

J.A. at 25. The panel also directed the Office of Compliance and Consumer Assistance ("OCCA") to participate in the proceeding. *Id.*

Petitioner resisted this procedure. On March 1, BC requested a pre-hearing conference. On March 5, BC sought review of the Review Board's order that an oral hearing be held. On March 9, BC moved to postpone the hearing stating that the Board's order to OCCA to participate in the hearing had left the carrier without adequate notice of the issues which OCCA would pursue at the hearing. On March 12, the motion for postponement was denied, and no pre-hearing conference took place.

The Providence hearing commenced on March 16 and concluded on March 19. Briefs were submitted on May 10, 1982. Del, Bedel, and Larrabee testified at the hearing, as did BC's vice-president. BC's

---

**1.** Del's protest was withdrawn by letter of December 30, 1981. Del's counsel subsequently protested that the withdrawal letter was improperly obtained by BC and informed the Commis-

sion that Del remained a protestant. Del asserted at the hearing on the application that it remained a protestant. Joint Appendix at 38 (hereinafter "J.A.").

president, Alan Bernson, did not attend the hearing despite the fact that the presiding Administrative Law Judge suggested to BC's counsel that Bernson should be present and testify. J.A. at 40. The ALJ later stated, Bernson "should have testified. It is apparent that only he, not his vice-president, could have responded to some of the allegations." *Id.* at 43. Several shippers submitted certifications in support of BC, but only one, E. Rosen, appeared in support of the application, and he testified that BC had knowingly transported goods illegally.

The ALJ concluded that "the applicant has failed to establish that it is fit ... properly to conduct the proposed operation and to conform to the requirements of the Interstate Commerce Act and the Commission's rules and regulations thereunder." J.A. at 43. The ALJ wrote in part:

> The unrebutted testimony reveals that applicant knowingly and willfully transported numerous unauthorized shipments in violation of the Act. Moreover, the evidence is not clear that these shipments were done in the good belief that the applicant carrier had proper operating authority. Also Commission investigators were consistently frustrated in many ways, [further,] mishandling the fuel surcharge, and failure to inspect vehicle equipment regularly took place.

*Id.* at 42–43. The ALJ concluded that given the lack of applicant's fitness, "no purpose would be served as to any finding or conclusion regarding public need." *Id.* at 43.

BC appealed the decision of the ALJ on June 5, 1982. The ICC, Division 1, denied BC's appeal by decision of August 23, 1982. The Commission wrote that:

> The record as summarized by the Administrative Law Judge discloses a repeated history of applicant's noncompliance with rules and regulations of this Commission, manifesting a general pat-

tern of conduct of purposely and willfully engaging in illegal activities. The subject violations, as discussed in the initial decision by the Administrative Law Judge are varied, numerous, and extremely serious. In our opinion, such conduct represents a flagrant and persistent disregard of the provisions of the Interstate Commerce Act and Commission rules and regulations. The Administrative Law Judge, who had opportunity to observe the demeanor of the witnesses at the hearing, reasonably concluded that based upon the evidence presented, applicant's past conduct and attitude toward the law and rules and regulations of the Commission, precluded a finding of fitness. We perceive no basis for disagreeing with this conclusion.

J.A. at 45–46 (footnote omitted).

BC then filed a Petition for Stay and a discretionary Petition for Administrative Review on September 7. The ICC denied both petitions on September 14. J.A. at 48–49. BC has now sought review in this court.

## II.

 The standard of review governing ICC actions on motor carrier applications for operating authority is well established. Before the Commission, the applicant has the burden of establishing that he is fit, willing, and able to provide the service and to comply with the statute and regulations. *See Curtis, Inc. v. ICC,* 662 F.2d 680, 687 (10th Cir.1981). If that is done, the applicant must show that the service he proposes will serve a useful public purpose. *See* 49 U.S.C. § 10922(b)(1) (1982). Evidence of past disregard for the law is not conclusive as to the applicant's future compliance but it raises a reasonable inference, which an applicant must overcome, that the applicant is likely to continue such misbehavior.[2] Our review of the Commission's decision

---

**2.** [T]he Commission has designed a five-part inquiry to determine whether past violations and

disregard of motor carrier regulations is likely

about an applicant's fitness is limited to insuring that it meets the requirements of section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2) (1982), including that it is supported by substantial evidence and is not otherwise arbitrary, capricious, or an abuse of discretion. We must also be attentive to procedural guarantees; we must be sure that the Commission has complied with the rules designed to guarantee the carrier-applicant the full and fair opportunity to present and defend its application.

BC advances four arguments on appeal: that the notice given it was inadequate; that its former employees should not have been permitted to testify; that the Commission improperly found that BC mishandled the fuel surcharge and frustrated Commission investigation; and that the Commission improperly used the fitness finding regarding unauthorized transportation as a punitive measure. We address these contentions seriatim.

### A.

BC's first argument is a claim of inadequate notice. BC asserts that an application proceeding is an adjudicatory proceeding subject to section 554(b)(3) of the APA, which requires that "[p]ersons entitled to notice of an agency hearing ... be timely informed of ... (3) the matters of fact and law asserted." 5 U.S.C. § 554(b)(3) (1982). The carrier alleges that it was denied any such notice and that as a result it was continually buffeted at the hearing on its application by surprise allegations and previously unanticipated assertions of damaging facts. Brief of Petitioner BC at 8–9. This lack of notice, BC concludes, destroys

the credibility of the findings of the Administrative Law Judge, including the ultimate finding that BC lacked the fitness necessary to gain its requested authority.

The ICC does not deny its obligation to give some notice of the issues to be addressed at a fitness hearing, but contends that the notice was adequate here. An applicant understands from the burden of proof he undertakes that all his operations are subject to review. This is an implicit notice from the nature of the proceedings. Here, moreover, BC fails "even [to] attempt to demonstrate that the lack of notice it alleges prejudiced it in any material way." Joint Brief for ICC & USA at 31. "It points to no evidence," the Commission states, "it might have had marshalled and introduced at the hearing had it been notified earlier and more formally of the facts which called its fitness into question." *Id.* Finally, as the agency notes: "The prehearing decisions of both the Board and the Division identified four issues—the *same* four issues—that the Commission believed warranted special attention. Furthermore, the ALJ's decision recited those same four reasons—unlawful transportation, misuse of the fuel surcharge, filing false statements, and interfering with a Commission investigation—as the focus of the oral hearing. And it was principally on those four bases that the application was denied." *Id.* (citation omitted).

■ We are satisfied that the notices of hearing that the Commission sent to BC were sufficient to alert BC to the subjects that would be examined at the fitness hearing. Both the February 1, 1982 letter from

to continue.... Under this test the Commission considers

 (1) [T]he nature and extent of ... [the carrier's] past violations, (2) the mitigating circumstances surrounding the violations, (3) whether the carrier's conduct represents a flagrant and persistent disregard of [the] Commission's rules and regulations, (4) whether it has made sincere efforts to correct its past mistakes, and (5) whether the applicant is willing and able to comport in the future with the

statute and the applicable rules and regulations thereunder.

*Curtis,* 662 F.2d at 687–88 (quoting *Associated Transport, Inc.,* 125 M.C.C. at 73) .... By weighing these factors, the Commission decides whether future compliance with motor carrier regulations is assured.

*Department of Transportation, Federal Highway Administration v. ICC,* 733 F.2d 105, 109–10 (D.C.Cir.1984).

the Review Board and the March 3, 1982 letter from Division 1 of the Commission referred to the verified statements of protestants Larrabee and Bedel. The letters noted that these protestants had raised numerous questions concerning BC's fitness including questions of unauthorized shipments, fraudulent administration of the fuel surcharge program, the submission of false information to the Commission, and other interference with Commission investigations. These specific references, as well as the more general notice that "there is a question whether applicant is fit, willing, or able properly to perform the service proposed," J.A. at 11, would have alerted even a naive and inexperienced carrier to the fact that the impending inquiry would be a thorough one. The Commission is not burdened with the obligation to give every applicant a complete bill of particulars as to every allegation that carrier will confront. The agency need not anticipate every charge that will be made. Nor did the letters convey an impression that they contained the complete roster of objections which BC would encounter.

The carrier cites the Commission's decision in *Braswell Motor Freight Lines, Inc., Investigation of Practices,* 118 M.C.C. 392 (1973), as supporting what amounts to a demand for complete detail in Commission notices of hearing. But *Braswell* held not that a notice must always be complete in all the particulars which a future hearing will cover, but rather that notice must not be of a kind to mislead an applicant. Evidence was excluded from that record because the notices provided the applicant in *Braswell* had "contained no additional caveats or warnings to respondents that other evidence might be presented, and on their face purported to afford notice to respondent of all the specific facts of the Bureau's case." *Braswell,* 118 M.C.C. at 397. Here, there was adequate notice, and our conclusion is reinforced by the fact that BC points to no specific charges that surprised it due to lack of notice. Insofar as BC's case was weak, that appears to be due

to the inexplicable refusal of applicant's president to attend the hearing to make his case. It may also be due to the circumstance that BC's case was, in fact, weak.

### B.

BC's second procedural objection focuses on the testimony of BC's former employees, Bedel and Larrabee. BC "submits that the granting of protestant status to former employees of applicant is in error and that protestant status may only be granted to motor common carriers or associations which represent carrier interest and which have broad policy concerns." Brief of Petitioner BC at 13. BC cites 49 U.S.C. § 10922(b)(7)(C) (1982), which provides:

> (7) No motor carrier of property may protest an application to provide transportation filed under this subsection unless—

> (C) the Commission grants leave to intervene upon a showing of other interests that are not contrary to the transportation policy set forth in section 10101(a) of this title.

Brief of Petitioner BC at 13. BC asserts that this section of the statute controls access to protestant status, and clearly limits that status to common carriers or associations of common carriers. The former employees, BC concludes, had no legitimate role to play in the application proceeding.

■ But section 10922(b)(7)(C), far from limiting the class of protestants, merely places limitations on motor carriers that would protest, and, as the ICC points out, "nowhere does the statute prevent noncarriers from participating in these proceedings." Joint Brief for ICC & USA at 28 (footnote omitted). The Commission notes that "intelligent regulation of the nation's interstate motor carrier industry requires that all interested persons with reliable and probative evidence (not simply carriers or carrier associations) be allowed to participate in ICC licensing proceedings." Joint

Brief for ICC & USA at 29. The Commission's own regulations in force at the time of the hearing expressly provided for the participation of any "person" in such a proceeding so long as that person's participation furthered the goals of the national transportation policy. 49 C.F.R. § 1100.-252(d)(7) (1981), *cited in* Joint Brief for ICC & USA at 29.[3] Finally, the ICC contends that the issue of protestant status for Larrabee and Bedel is irrelevant as these two could have participated as witnesses even if they had not become involved as protestants.

◼ We reject BC's objections to the participation of its former employees. Elsewhere in the same section BC relies on, the Commission is commanded to examine "evidence presented by persons objecting to the issuance of a certificate ...." 49 U.S.C. § 10922(b)(1)(B) (1982). "Person" is surely broad enough to allow the testimony of former employees. The court is aware that former employees may very well "have an axe to grind against an applicant." Brief of Petitioner BC at 16. That is a legitimate concern to be considered by the Commission and its hearing officers. They are in a position to judge credibility. It is certainly not beyond an applicant's ability to counter the testimony of a former employee if that testimony is exaggerated or even false. "The important point," as Judge Bazelon has said, "is that administrative standing should be tailored to the functions of the agency ...." *Koniag,*

*Inc., Village of Uyak v. Andrus,* 580 F.2d 601, 616 (D.C.Cir.1978) (Bazelon, J., concurring). The ICC's function in this application proceeding was to determine the applicant's fitness. Larrabee and Bedel were well positioned to assist that function, and there exists no automatic bar to their participation as protestants.

**C.**

◼ As we have already noted, "[t]he applicant for a certificate has the burden of proving his fitness." *Department of Transportation, Federal Highway Administration v. ICC,* 733 F.2d 105, 109 (D.C.Cir.1984). When the Commission finds that an applicant is not fit, we are bound to affirm its determination if that finding is supported by substantial evidence and is not otherwise arbitrary, capricious, or an abuse of discretion. *Id.* at 110. Here the Commission concluded that the "record as summarized by the Administrative Law Judge discloses a repeated history of applicant's noncompliance with rules and regulations of this Commission, manifesting a general pattern of conduct of purposely and willfully engaging in illegal activities." J.A. at 45. "The subject violations," the Commission concluded, "are varied, numerous, and extremely serious." *Id.* The Commission refers us to evidence of the applicant's numerous unauthorized shipments, J.A. at 39, Joint Brief for ICC & USA at 15–18, the applicant's attempted cover-up of these shipments by manipula-

---

**3.** § 1100.252 read in part:

*How to oppose requests for authority.*

(a) *Definitions.* A person wishing to oppose a request for permanent authority files a *protest.* A person filing a valid protest becomes a *protestant.*

....

(d) *Qualifications format.* This information shall be submitted in separately numbered paragraphs:

(5) Description of the extent to which the person seeking to protest possesses authority to handle the traffic for which authority is applied ... *or*

(6) Description of any application which the prospective protestant has pending before

the Commission which was filed before applicant's application and which is substantially for the same traffic, *or*

(7) Description of any other legitimate interest not contrary to the transportation policy set forth in 49 U.S.C. 10101(a), or of any right to intervene under a statute. A person seeking to qualify under this paragraph shall describe in detail the circumstances which warrant its participation and how they are consistent with 49 U.S.C. 10101(a). The Commission shall normally permit such person to intervene when it shows that a proceeding is novel or of first impression, is of industry wide importance, or has significant economic impact.

tion of its computer records, J.A. at 225–28, the failure to ensure compliance with applicable safety laws, J.A. at 152, the filing of fraudulent supporting shipper statements, J.A. at 90, payment of a kick-back, J.A. at 238, and manipulation of an ICC program known as the fuel surcharge despite BC's knowledge that it had been incorrectly billing the surcharge, J.A. at 252.

BC attempts to treat the damaging evidence by arguing first that it did in fact apply the fuel surcharge correctly. Brief of Petitioner BC at 17–19.[4] It also argues that the ICC is penalizing BC for "asserting its rights." BC suggests that "[t]here is absolutely no obligation that a carrier's president submit to interview or direct its employees to submit to interview by an ICC investigator." *Id.* at 21. As to the testimony that BC doctored the computer printouts in order to mislead the ICC, BC asserts that "the record is unclear whether or not this computer printout was prepared." *Id.* BC points to the statement of an ICC investigator at the hearing that "I asked for accounts receivable records and I never got 'em. It was always an excuse." J.A. at 331. BC finds in this testimony a conclusion that since the document was never submitted, its alleged preparation should not have prejudiced the Commission against BC's application. Brief of Petitioner BC at 27. Finally, BC characterizes the unauthorized shipments as "occasional instances of unauthorized transportation," and defends even these instances as the result of "honest misinterpretation of Commission rules relaxing entry." *Id.* at 22–23. BC also notes that it has subsequently applied for the necessary authority to conduct similar shipments and has in fact been granted some of that authority. *Id.* It is

typical of Commission policy, BC concludes, to forgive and forget unauthorized shipments when a carrier comes forward to apply for the necessary authority to cover future similar shipments. *Id.*

 Because we find that the opinions of the ALJ and the Commission lack specificity at certain points, are often confused, and occasionally appear even to be in error as to the contents of the record, we have conducted a thorough review of the record. We are unable to conclude that the Commission lacked substantial evidence for a decision to deny BC's application though it did not display the ability to explain its position coherently and completely—a defect which, while irritating, is by no means fatal to the Commission's positions on appeal. Indeed, the record overflows with evidence of BC's lack of fitness, and it was BC's burden to demonstrate precisely the opposite in order to earn the authority requested. "The 'substantial evidence' examination looks to whether the record, taken as a whole, contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Trailways, Inc. v. ICC,* 673 F.2d 514, 517 (D.C. Cir.1982) (quoting *National Council of American-Soviet Friendship, Inc. v. Subversive Activities Control Board,* 322 F.2d 375 (D.C.Cir.1963)), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). Here the evidence necessary to the conclusion of a lack of fitness is present in abundance.

 The fact that unauthorized transportation occurred is undisputed. J.A. at 106. The applicant also admitted to shoddy safety inspection practices, *id.* at 122, 152, an admission which, even stand-

---

4. We note that while the decision of the ALJ made reference to the carrier's misapplication of the fuel surcharge, J.A. at 38, 43, that decision made no effort to explain why the ALJ was convinced of this conclusion. Nor did the Commission when it adopted the ALJ's findings by reference. *Id.* at 45. It is hardly agency decision-making at its finest to leave in governing opinions announced but unexplained conclu-

sions regarding intricate regulatory programs. We are surprised that the agency attached so little importance to making this portion of its decision easily understood. Because this section of the opinion is conclusory, we have paid particular attention to that portion of the record dealing with BC's handling of the fuel surcharge.

ing alone, might be sufficient to support a finding of a lack of fitness. The record also reveals that BC repeatedly interfered with Commission investigations. *Id.* at 219–21, 225, 274. We need not pass on BC's novel argument that such efforts on its part were not illegal to conclude that the Commission could find in those actions reason to suspect that the carrier's future operations might be difficult to monitor. There is testimony, too, that BC altered records in the hope that the doctored documents would conceal unauthorized shipments, *id.* at 226–27, and that BC paid a kick-back on at least one occasion, *id.* at 238, 294–95. Evidence was also received that BC purposefully overcharged when calculating the fuel surcharge, having decided that even if discovered, it would profit by the system even after refunds were paid. *Id.* at 253–54. The testimony of the ICC investigator, Mr. Paul H. Blanchette, *id.* at 277–335, is itself sufficient to support the conclusion that BC was intent on frustrating the Commission's oversight responsibilities. The Commission thus possessed substantial evidence for its conclusion that this carrier had not shown that it was fit to receive the authority requested.[5]

We wish to note, however, that we have not been favorably impressed with the Commission's work on this case. Perhaps the ICC and its ALJ allowed themselves to be lulled into careless opinion-writing by the sheer weight of the evidence against BC's application and by the fact that BC had the burden of proof. Moreover, the notice provided BC, while adequate, could

have been more complete, and we doubt that any harm would have been done by granting BC's request for a pre-hearing conference or a postponement. It is petitioner's near-total failure to present any evidence of fitness that protects the ICC on review, not the efforts of the Commission.

*Affirmed.*

5. Throughout this proceeding, BC has attempted to file supplemental papers, such as documents gained through the Freedom of Information Act process and an affidavit from a self-styled investigative reporter who asserted familiarity with the facts of this case. This is an abuse of Rule 28(j) of the Federal Rules of Appellate Procedure. Most of what BC has forwarded to the court is would-be evidence that is untested. Its submission might be appropriate in renewed proceedings before the ICC, but it is clearly separate from and irrelevant to the record under review here. We have taken note of the ICC's decision in Boston Carrier, Inc., No. MC–146440 (Sub-No. 13) (Apr. 27, 1984), in which

the Commission granted a one-year certificate of authority to BC to transport general commodities between points in Connecticut, New Hampshire, New Jersey, New York and Vermont on the one hand and, on the other, other points in the contiguous United States. That decision, while it reflects upon the earlier ICC decision under review here, does not purport to upset the earlier denial of authority. We will not imply a reversal of the Commission's earlier holding from its action on an application filed at a different time and concerning different routes.