**ERICKSON TRANSPORT CORPORATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 83–1011.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1983.

Decided Feb. 27, 1984.

John E. Jandera, Jandera, Gregg & Barker, Topeka, Kan., for Erickson Transport Corp.

William F. Baxter, Asst. Atty. Gen., Robert B. Nicholson, Marion Jetton, Attys., Appellate Sec., Antitrust Div., Dept. of Justice, John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Edward J. O'Meara, Atty., I.C.C., Washington, D.C., for respondents.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge and JOHN R. GIBSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Erickson Transport Corporation petitions for review of an order by the Interstate Commerce Commission granting motor carrier operating authority to Stewco, Inc. We affirm the Commission's decision.

I.

On May 10, 1982, pursuant to 49 C.F.R. §§ 1100.251–.253 (1981), Stewco, Inc., a Texas Corporation, filed an application with the Interstate Commerce Commission (ICC) for an extension of motor carrier operating authority. The application was considered under the modified procedure.[1] Stewco requested authority to transport liquid commodities, in bulk, between two Arkansas counties, on the one hand, and all points in the continental United States on the other hand.

The application was accompanied by a verified statement from Stewco's president. The statement included: an acknowledgment of Stewco's existent interstate authority for other commodities; a description of Stewco's facilities in Arkansas; a description of the services the company intended to offer the supporting shipper; a detailed list of Stewco's available equipment; and an assertion that the grant of authority would permit Stewco to eliminate deadhead mileage and its accompanying waste of fuel.

Stewco's application was supported by one shipper, Riceland Foods, Inc., (Riceland). Riceland stated that it had been receiving intrastate service from Stewco, and that a grant of interstate authority would enable Stewco to provide more efficient service. Riceland anticipated tendering approximately ten shipments per week to Stewco. Riceland maintains facilities in the two Arkansas counties from which Stewco requested authority to transport. For representative destinations, Riceland simply named fifteen states surrounding Arkansas.[2] Riceland also documented numerous

---

1. Under 49 C.F.R. §§ 1100.43–.52 (1981) the ICC reviews the verified statements of appli-cants and protestants. There are no personal appearances or oral hearings.

2. The fifteen states were Alabama, Arizona,

merous service problems it had experienced with motor carriers, none of which involved the petitioner in this case.

Written protest to Stewco's application was filed by four trucking companies, only one of whom, Erickson Transport Corporation, appealed to this court.[3] Prior to Stewco's application, Erickson had been providing interstate service to Riceland since 1980. Erickson had invested a significant amount of money in order to provide service to Riceland and, in turn, Erickson drew a significant amount of its revenue from this service. In the protest statement submitted to the ICC, Erickson acknowledged that it handled approximately 95% of Riceland's interstate shipping business. Riceland had previously supported Erickson's petition to the ICC for interstate authority. Erickson's business with Riceland had enabled Erickson to reduce its deadhead mileage and expenses. Before the review board, and on appeal to this court, Erickson asserted that granting Stewco's application would divert traffic from Erickson which, in turn, would result ultimately in a loss of revenue, wasted fuel, unemployment, rate increases and a disruption in the flow of commercial traffic.

On September 17, 1982, an ICC review board approved a partial grant of the application, extending Stewco's authority to the fifteen states named by Riceland in its statement of support, rather than to all points in the continental United States as

Stewco had requested. In its decision, the review board found that Stewco had proved there was a need for its service by submitting Riceland's supporting statement. The board noted that, while the evidence was less specific than might be desired, it was sufficient to establish a need between the Arkansas counties and the states named in Riceland's statement. The board held Erickson had failed to establish that granting the authority to Stewco was inconsistent with the public convenience and necessity.

Specifically, the board found: Stewco's service would serve a useful public purpose, responsive to a public demand or need; Stewco was fit, willing and able to perform the service and; granting the application would not affect either the quality of the human environment or the conservation of energy resources. Erickson entered an appeal from the review board's opinion. The appeal was denied and a final order granting Stewco interstate authority was rendered. Erickson petitions for judicial review of the Commissioner's decision. Because this is the first time this Circuit has reviewed the new guidelines for licensure under the 1980 Motor Carrier Act, we consider the petitioner's arguments in detail.

## II.

Until 1980, entry into the trucking industry was governed by the Motor Carrier Act of 1935.[4] The guidelines for licensure of

---

Colorado, Florida, Georgia, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Mexico, Oklahoma, Texas and Tennessee.

3. Miller Transporters, Inc., Steere Tank Lines, Inc., and Truck Transport, Inc., also filed protests with the I.C.C.

4. 49 U.S.C. §§ 10101–11916 (Supp. II 1978). The transportation policy behind the Act, as amended in 1978, was as follows:
 (a) To ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States . . . it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—
 (1) to recognize and preserve the inherent advantage of each mode of transportation;
 (2) to promote safe, adequate, economical, and efficient transportation;
 (3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;
 (4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;
 (5) to cooperate with each State and the officials of each State on transportation matters; and
 (6) to encourage fair wages and working conditions in the transportation industry.
 (b) This subtitle shall be administered and enforced to carry out the policy of this section.
 49 U.S.C. § 10101 (Supp. II 1978).

motor carriers under the 1935 Act were, in pertinent part, as follows:

> (a) ... the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation ... as a motor common carrier or water common carrier, respectively, if the Commission finds that—
>
> (1) the person is fit, willing and able—
>
> (A) to provide the transportation to be authorized by the certificate; and
>
> (B) to comply with this subtitle and regulations of the Commission; and
>
> (2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

49 U.S.C. § 10922(a) (Supp. II 1978).

The Motor Act of 1980 effected a radical change in the 1935 Act. By adding a new paragraph to the law, Congress changed the entire thrust of the public policy behind motor carrier regulation. The law now provides, in pertinent part:

> It is the policy of the United States government ...
>
> . . . .
>
> ... (7) with respect to transportation of property by motor carrier, to promote *competitive* and efficient transportation services ....

49 U.S.C. § 10101(a)(7) (Supp. V 1981) (emphasis added). To this end, Congress also amended the guidelines for licensure. In addition to the requirements of the 1935 Act, noted above, the 1980 Act also provides:

> (b)(1) ... the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation ... as a motor common carrier of property if the Commission finds—
>
> (A) that the person is fit, willing and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and
>
> (B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need; unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.
>
> (2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:
>
> (A) the transportation policy of section 10101(a) of this title; and
>
> (B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

49 U.S.C. § 10922(a)–(b)(1) & (2) (Supp. V 1981).

■ If these amendments, by themselves, do not reflect clearly the Congressional intent behind the changes, the intent is made crystal clear in the Act's legislative history. Congress intended to remove the protective shield which served to shelter existing motor carriers from competition, and open up the industry to competition in order to better serve the public. *H.R.Rep. No. 1069,* 96th Cong., 2d Sess. 3, 12, 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2283, 2285, 2294, 2295.

In the House Report, the Committee on Public Works and Transportation noted the policy behind licensure under the 1935 Act:

> [t]he Motor Carrier Act of 1935 adopted a regulatory scheme of limited entry into the business of transportation by motor vehicle "on the premise that the public interest in maintaining a stable transportation industry so required."

*Id.* at 12, *reprinted in* 1980 *U.S.Code Cong. & Ad.News,* 2294, *quoting United States v. Drum,* 368 U.S. 370, 373–74, 82 S.Ct. 408, 409–10, 7 L.Ed.2d 360 (1962). To this end,

the ICC had defined the statutory standard of public convenience and necessity which an applicant for motor carriage would have had to meet, as follows:

whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

*Id.* at 13, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2295, *quoting Pan-American Bus Lines Operations,* 1 M.C.C. 190, 203 (1936).

The legislative history of the 1980 Act reveals that it was to stand in stark contrast to the 1935 Act:

the Committee clearly rejects the historic approach of the Commission toward applications for authority to operate as motor common carriers of property. [The amendment] reflects the Committee's strong belief that increased competition and potential competition will bring about the most efficient and economical delivery of transportation service to the public.

*Id.* at 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2296. Prior to the 1980 Act, granting interstate authority to a new carrier solely for purposes of competition was disallowed because competition was viewed as harmful to the public as well as to other motor carriers. *See Argo-Collier Truck Lines, Inc. v. United States,* 611 F.2d 149, 155 (6th Cir.1979). Under the 1980 Act it appears that competition is, per se, in the public interest. *See House Report,* 3, 12, 14, *reprinted in* 1980 *U.S.Code Cong. & Ad. News* 2285, 2294, 2295.

### III.

Our review of an ICC order is governed by the Administrative Procedure Act. 5

U.S.C. § 706(2)(A)–(E). Under the APA this court is to hold unlawful and set aside agency actions, findings or conclusions which are: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; or (2) not supported by substantial evidence. *Id.*[5] Under the arbitrary and capricious standard:

[a] reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency". . . . The agency must articulate a "rational connection between the facts found and the choice made". . . . While we may not supply a reasoned basis for the agency's action that the agency itself has not given . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) (citations omitted). *See Illinois Terminal R.R. Co. v. Interstate Commerce Comm'n,* 671 F.2d 1214, 1216–17 (8th Cir.1982).

 Under the "substantial evidence" test the Commission's findings will be affirmed when the evidence would be sufficient to justify a refusal to direct a verdict if the trial was to a jury. *Illinois Central R.R. Co. v. Norfolk & Western R.R. Co.,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *American Textile Mfrs., Inst. v. Donovan,* 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1980), *quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *See also*

---

**5.** These standards are separate and distinct. "Though an agency's finding may be supported by substantial evidence . . . it may nonetheless reflect arbitrary and capricious action." *Bow-*

*man Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974).

*McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983). Under this test the record must be reviewed as a whole. *Illinois Central,* 385 U.S. at 66, 87 S.Ct. at 260; *Illinois Terminal,* 671 F.2d at 1216–17. In addition, "the test must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1950); *McMillian,* 697 F.2d at 220.

■ However, the substantial evidence test is a narrow one, and the reviewing court is not to substitute its conclusions for those of the Commission. *Illinois Central,* 385 U.S. at 69, 87 S.Ct. at 262; *Cohen v. Civil Aeronautics Bd.,* 657 F.2d 999, 1002 (8th Cir.1981). The possibility of drawing two inconsistent conclusions from the evidence does not mean the agency's findings are unsupported by substantial evidence. *American Textile,* 452 U.S. at 523, 101 S.Ct. at 2497. Finally, ICC orders are vested with a presumption of validity which is not disturbed easily on appeal. *Interstate Commerce Comm'n v. City of Jersey City,* 322 U.S. 503, 512–13, 64 S.Ct. 1129, 1133–34, 88 L.Ed. 1420 (1944); *see Warren Transp., Inc. v. United States,* 525 F.2d 148, 151 (8th Cir.1975) ("It is rare that a Commission order is not based on relevant factors or that the exercise of its expertise can be termed such an abuse of discretion as to require reversal....") With these standards in mind, we review the petitioner's contentions.

### IV.

The procedure to be followed in federal agency determinations is governed by the Administrative Procedure Act.[6] As to the burden of proof, the proponent of a rule or order carries the initial burden. 5 U.S.C. § 556(d) (1976). The Motor Carrier Act of 1980 did not change this assignment, thus applicants for authority have the initial burden of proof under the 1980 Act[7] just as they did under the 1935 Act.[8] However,

the 1980 Act did redistribute the weight of the burdens which applicants and protestants would bear.

■ Congress adopted the 1980 Act in order to liberalize entry into the trucking industry. *House Report* at 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2296. The 1980 Act:

> provides for a balanced approach to entry, which, by lessening the burden of proof on applicants and correspondingly increasing the burden on persons opposing the application, will encourage new applicants to file for authority to provide needed service.... Whereas, in the past, applicants have been expected to carry the greater evidentiary burden, *the Act now assigns to protestants a much larger share of the evidentiary burden.*

*Id.* (emphasis added). Initially, the applicant must prove it is "fit, willing and able" to provide the proposed service and that the service will serve a "useful public purpose, responsive to a public demand or need ...." *C & H Transp. Co., Inc. v. Interstate Commerce Comm'n,* 704 F.2d 850, 853, 856 (5th Cir.1983); *Kenosha Auto Transp. Co. v. United States,* 684 F.2d 1020, 1026 (D.C.Cir.1982); *Baggett Transp. Co. v. United States,* 666 F.2d 524, 527–28 (11th Cir.1982); 49 U.S.C. § 10922(b)(1) (Supp. V 1981); *House Report* at 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2296.

The "fit, willing and able" test refers to an applicant's ability to carry out the proposed service, *see Senate Comm. on Commerce, Science & Transp., 96th Cong., 2d Sess., Report on Motor Carrier Act of 1980* 5 (Comm. Print 1980), and should be satisfied when the applicant has the wherewithall to perform the service. The "public purpose" test can be satisfied by any number of ways. This demonstration "could be made by public officials, shippers, receivers, trade associations, civil associations, consumers and employee groups, as well as by the applicant itself." *House Report* at 14

---

**6.** 5 U.S.C. §§ 551–8912 (1976).

**7.** 49 U.S.C. § 10922(a)–(b) (Supp. V 1981).

**8.** *See* 49 U.S.C. § 10922(a) (Supp. III 1979). Unless the statute indicates otherwise the burden of proof is assigned to proponent under 5 U.S.C. § 556(d) (1976).

*reprinted in* 1980 *U.S.Code Cong. & Ad. News* 2296. There is some, albeit slim, authority for the proposition that any one of these factors would satisfy the public purpose test. *Kenosha* 684 F.2d at 1028; 126 *Cong.Rec.* 16,042–43 (1980) (remarks of Sen. Packwood).

■ Once the applicant has satisfied both of these tests, i.e., made a prima facie case, the burden of proof shifts to the protestant to show that the issuance of the certificate is inconsistent with the public convenience and necessity. *Refrigerated Transp. Co., Inc. v. Interstate Commerce Comm'n,* 709 F.2d 1430, 1432 (11th Cir.1983); *Dean Truck Lines, Inc. v. Interstate Commerce Comm'n,* 688 F.2d 254, 255 (5th Cir.1982); *Kenosha,* 684 F.2d at 1027; 49 U.S.C. § 10922(b)(1) (Supp. V 1981); *House Report* at 15, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2297. In other words, once the applicant has established a prima facie case, the statute creates a rebuttable presumption that granting the application is consistent with the public convenience and necessity. *C & H Transp. Co., Inc. v. Interstate Commerce Comm'n,* 704 F.2d 834 at 841 (5th Cir.1983); *House Report* at 15, *reprinted in* 1980 *U.S. Code Cong. & Ad.News* 2297.

■ Under the statutory guidelines, the ICC is to consider and, to the extent applicable, make findings on the policy behind the Act and on the effects which issuance of a new certificate will have upon existing carriers. 49 U.S.C. § 10922(b)(2) (Supp. V 1981). However, diversion of revenue or traffic from an existing carrier is *not,* in and of itself, inconsistent with the public convenience and necessity. 49 U.S.C. § 10922(b)(2)(B) (Supp. V 1981). Protestants must show that issuance of a new certificate will result in specific harm to the public interest, i.e., harm which damages existing carriers to the extent that the public is deprived of essential services. *Deaton, Inc. v. Interstate Commerce Comm'n,* 693 F.2d 128, 131 (11th Cir.1982).

■ Erickson contends, for several reasons, that Stewco failed to meet both the "fitness" and "public purpose" tests. First, Stewco did not meet the fitness test because it failed to offer any proof that it was financially able to provide the proposed service or that it would have the equipment necessary for interstate movement available. Neither of these contentions have merit.

Under the rules published by the ICC pursuant to the 1980 Act, applicants are no longer required to submit specific evidence regarding financial fitness in order to obtain operating authority.[9] *American Transfer & Storage Co. v. Interstate Commerce Comm'n,* 719 F.2d 1283, 1304, 1305 (5th Cir. 1983). In addition, the record shows that, at the time the application was submitted, Stewco was involved in the interstate movement of other commodities, Stewco was providing intrastate service to the supporting shipper and Stewco had established a satellite terminal to accommodate the supporting shipper's needs. Further, along with its application Stewco submitted a detailed list of its available equipment. Petitioner did not introduce any evidence to the contrary. Based on the record, the Commission's finding that Stewco was fit, willing and able to provide the proposed service was supported by substantial evidence and was neither arbitrary nor capricious.

---

9. *Rules Governing Applications for Operating Authority,* 364 I.C.C. 508, 539–41 (1980). There is a rationale for abandoning the requirement:

[t]he basis for this policy no longer exists. Under ... the new act, carriers are encouraged to tailor price and service options in such a way that the public will have greater choices. The marketplace will ultimately determine the financial success of a proposed operation. At the same time, a financial failure will not translate into any long-term service vacuums since our entry policies will permit the rapid replacement of carriers that fail. That is not to say that we are unconcerned with the common carrier obligation and service to small shippers and communities. We will continue to examine equipment availability, however, and an applicant will be required to describe its equipment, or how it would obtain equipment to perform the operation in the short run .... *Id.* at 540.

Erickson also contends that Stewco failed to meet the "public purpose" test. First, Erickson asserts that it was meeting Riceland's needs and thus Stewco's service was not needed by either the public or Riceland. Under the 1980 Act, this assertion no longer carries any weight. Under the 1935 Act, the ICC guidelines for licensing new motor carriers included the criterion of whether the proposed service was being served adequately by existing lines or carriers. *Pan-American Bus Lines Operations*, 1 M.C.C. 190, 203 (1936). However, this particular requirement was abandoned even before the 1980 Act, *see Assure Competitive Transp., Inc. v. United States*, 635 F.2d 1301, 1304 (7th Cir.1980), and the abandonment was reinforced with passage of the 1980 Act. *See House Report* at 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2296. *See also* 126 *Cong.Rec.* 16,042 (1980) ("The fact that another carrier is performing the service is no longer an obstacle to acquiring new authority.") (remarks of Sen. Cannon).

Second, Erickson contends that the shipping public will suffer harm if Stewco's application is granted because Erickson will have to terminate service to some shippers and increase its rates in order to compensate for the traffic Stewco will divert. Erickson's argument fails to take account of significant points. Riceland, as a member

of the shipping public, requested Stewco's service. In addition, Congress has determined that increased competition is in the public's best interests. *See House Report* at 3, 11, 12, 14, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2285, 2293, 2294, 2296. Before Stewco entered the picture, Erickson monopolized 95% of Riceland's interstate business. This type of monopoly is what the 1980 Act was intended to prevent.

Increased competition inevitably results in short term, and perhaps permanent, harm to existing carriers. However, the 1980 Act provides that this harm is an insufficient basis for denying an extension of operating authority. Whether we agree with the policy of increased competition is irrelevant. It is not within the province of this court to substitute its judgment for that of the Congress. Where, as here, a shipper's business is monopolized by one carrier the Congressional mandate is clear—the public will benefit from increased competition and the ICC is to review applications for licensure utilizing that rationale.

■ Finally, Erickson contends that the ICC's order must be reversed because the Commission failed to make specific findings on each element of the National Transportation Policy.[10] However, neither the 1980

---

**10.** 49 U.S.C. § 10101 (Supp. V 1981). The statute provides:

(a) . . . to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States . . . it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters;

(6) to encourage fair wages and working conditions in the transportation industry; and

(7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and

Act on its face nor the Act's legislative history requires the Commission to make individual findings on each element of the National Transportation Policy. To the contrary, the legislative history indicates that the Commission is to "balance" these factors while recognizing "competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives." *House Report* at 14, *reprinted in* 1980 *U.S. Code Cong. & Ad.News* 2294. Unless these means collide with the public interest, they are to be given primary consideration. The Commission's decision reflects consideration of these goals.

There is some support in case law for Erickson's contention. *See Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1072 (5th Cir.1982) ("... the Commission cannot disregard the statutory mandate to consider fuel and economic efficiencies under the National Transportation Policy .... Of course, these factors will not necessarily be determinative .... Nevertheless, the Commission should ordinarily engage in explicit consideration of these factors.") *But see C & H Transp. Co., Inc. v. Interstate Commerce Comm'n,* 704 F.2d 834, 847, 847 n. 20 (5th Cir.1983) ("The National Transportation Policy must guide the ICC in all its decisions. However, the ICC need not explicitly discuss in its decision each factor enumerated in section 10101. All that is necessary is that the essential basis of the ICC's rationale be clear enough so that a court can satisfy itself that the ICC has performed its function.")

Further, it must be conceded that judicial review of ICC decisions would be facilitated if the ICC did make specific findings on the elements in the National Transportation Policy. Making specific findings also might quiet the contentions of protestants, particularly because Congress made the Policy available to protestants as a means for objecting to new authority. *House Report* at 15, *reprinted in* 1980 *U.S.Code Cong. & Ad. News* 2297. However our review of the

competitive privately-owned motor carrier system; (G) promote greater participation by

legislative history behind the 1980 Act and case law convinces us that the Commission's failure to make explicit, individual findings under the National Transportation Policy is not a basis for reversal. *See RTC Transp., Inc. v. Interstate Commerce Comm'n,* 708 F.2d 620, 626 (11th Cir.1983); *C & H Transp. Co.,* 704 F.2d at 847, 847 n. 20.

Our review of the record reveals that there is a rational connection between the Commission's findings and its decision which is supported by substantial evidence. Stewco established its prima facie case by demonstrating that it was fit, willing and able to perform the proposed service and that there was a public need for the service. Erickson failed to rebut the presumption arising from the prima facie case; that Erickson will experience financial injury and increased competition is insufficient to carry its burden of controverting the Commission's finding that the transportation proposed would serve a useful public purpose. Thus, the order granting interstate authority to Stewco was not erroneous and the decision of the Commission must be affirmed.

HEANEY, Circuit Judge, dissenting.

In granting motor carrier operating authority to Stewco, Inc., the ICC failed to follow the requirements of the Motor Carrier Act in two essential respects. It failed to find sufficiently that Stewco is "fit, willing, and able" to provide the service applied for, and it failed to provide sufficiently specific findings to support its decision. I therefore dissent.

To justify the issuance of a certificate authorizing a person as a motor common carrier of property, the ICC must find "that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission." 49 U.S.C. § 10922(b)(1)(A) (Supp. V 1981). The ICC was able to make this finding here because, in 1980, it abandoned the requirement that applicants prove their fitness in

minorities in the motor carrier system; and (H) promote intermodal transportation.
*Id.*

financial terms. *Rules Governing Applications for Operating Authority,* Ex Parte No. 55 (Sub-No. 43), 364 I.C.C. 539 (1980).

Notwithstanding the 1980 abandonment, both the Tenth and Fifth Circuits have since left the financial requirement intact, defining "fitness" under the statute as: (a) the applicant's financial fitness or ability to perform the service it seeks to provide; (b) its willingness to comply with the Interstate Commerce Act and regulations promulgated thereunder; and (c) its ability to perform the proposed service in a proper and safe manner for the protection of the public. *C & H Transportation Co. v. ICC,* 704 F.2d 834, 843 (5th Cir.1983); *C & H Transportation Co. v. ICC,* 704 F.2d 850, 854 (5th Cir.1983); *Curtis, Inc. v. ICC,* 662 F.2d 680, 685 (10th Cir.1981).[1] At least one court has reversed the ICC's grant of an operating certificate due to a lack of substantial evidence of financial fitness. *Greyhound Lines, Inc. v. United States,* 600 F.2d 999, 1001 (D.C.Cir.1979).

As with any agency's interpretation of a statute, a court should defer to the ICC's interpretation of "fitness" so long as it is consistent with the mandate and policy Congress intended. *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Nebraska v. Federal Labor Relations Authority,* 705 F.2d 945, 947–948 (8th Cir.1983). Abandoning the financial fitness requirement contradicts the intention of Congress in passing the Motor Carrier Act of 1980. To be sure, Congress did intend "increased opportunities for new carriers to get into the trucking business and for existing carriers to expand their services." H.R.Rep. No. 1069, 96th Cong., 2d Sess. 3, *reprinted in* 1980 U.S.Code Cong.

& Ad.News 2283, 2285. Congress chose to make it easier for carriers to acquire an operating certificate by modifying the traditional "public convenience and necessity" test. *See* 49 U.S.C. § 10922(b); H.R.Rep. No. 1069, *supra,* at 13–14, 1980 U.S.Code Cong. & Ad.News at 2295–2296. In essence, under the new law, public convenience and necessity is to be determined less by the ICC, and more by the marketplace. *Id.* at 14–15, 1980 U.S.Code Cong. & Ad.News at 2296–2297.

Congress made it clear, however, that it wanted fitness to be determined by the ICC, as in the past.[2] The House Report specifies that while modifying the public convenience and necessity test, and in some instances removing it entirely, Congress intended to keep the fitness requirement intact. H.R.Rep. No. 1069, *supra,* at 13–16, 1980 U.S.Code Cong. & Ad.News at 2295–2298. Thus, it appears to be Congress's view that competition is promoted by entry of healthy, fit competitors.

It should be noted that the ICC had proposed to eliminate individual consideration of applications altogether, and instead adopt a "master certification approach." Ex Parte No. MC–135, *Master Certificates and Permits.* Congress refused, however, to allow the ICC such expansive discretion:

> [I]t is incumbent on the Congress to provide the Commission with guidance regarding motor carrier entry policy. A liberalized entry policy will have a significant impact on the motor carrier industry. For example, relaxed entry standards and increased competition for traffic will have a direct effect on employment in the industry and on the industry itself. Broad policy decisions of this type should be made by the Congress and

---

**1.** The definition of fitness utilized in the cited cases appears to have been based on prior ICC decisions, *see, e.g., Consolidated Carrier, Inc., Common Carrier Application,* 131 M.C.C. 104, 108 (1978); *Eagle Motor Lines, Inc., Investigation and Revocation of Certificates,* 117 M.C.C. 30, 35 (1972).

A different Fifth Circuit panel than that which decided the *C & H Transportation* cases recently approved the ICC's move to abandon the financial fitness requirement, based on defer-

ence to its expertise, in *American Transfer & Storage Co. v. ICC,* 719 F.2d 1283, 1303–1305 (5th Cir.1983); *see also Steere Tank Lines, Inc. v. ICC,* 703 F.2d 927, 930 & n. 10–931 (5th Cir.1983).

**2.** A determination of public convenience and necessity is an entirely independent inquiry from fitness, *Curtis, Inc. v. ICC,* 662 F.2d 680, 685 (10th Cir.1981).

should not be left to the discretion of the Commission.

H.R.Rep. No. 1069, *supra,* at 13, 1980 U.S. Code Cong. & Ad.News at 2295.

We have no right to do what Congress refused to do.

The ICC has adopted its own entry policy in which individual consideration of applications is no longer a meaningful process. In the instant case, the ICC's entire evaluation of Stewco's fitness was as follows:

> Applicant has been serving shipper in intrastate commerce, shipper is satisfied with its service, and applicant appears able to provide it an interstate service which should be of some value. If applicant is unable to provide service comparable to that of protestants, then protestants need have no fear of its competition.

*Stewco, Inc., Extension—Two Arkansas Counties,* No. MC–127253 (Sub-No. 56), slip op. at 4–5 (Sept. 7, 1982).

The ICC's final decision on appeal simply stated:

> The Commission no longer examines a carrier's financial position, and only in rare circumstances does it attach significant weight to operational concerns. We see nothing here to suggest that applicant is unable to provide the shipping and receiving public a service that is shown to be needed.

*Stewco, Inc., Extension—Two Arkansas Counties,* No. MC–127253 (Sub-No. 56), slip op. at 1 (Nov. 18, 1982).

The problem is that Stewco's application provided very little if any information to show that it was fit, financially or otherwise. The ICC's decision is written as though Stewco does not bear the burden of showing fitness, although the statute clearly places that burden on the applicant. The only evidence offered by Stewco in support of its application centered on its existing interstate authority to transport other com-

modities, and the intrastate service it performs for the shipper. If the ICC is granting certificates to anyone who states that they have a truck in their possession and has not violated safety regulations, then the fitness test is meaningless and judicial review is absurd.

In fact, counsel for the ICC reported to the Court that no applications since at least September 1, 1981, have been denied by the ICC due to financial fitness concerns. Only seven applications were denied in whole or in part on any kind of fitness consideration; these were due to the carrier's bad safety record and/or demonstrated misconduct. Thus, the ICC's policy and practice are contrary to congressional intent both to retain the fitness requirement in full, and to keep the burden of proving fitness on the applicant.

The Commission's action has direct and significant consequences. Failing to screen out unfit carriers has not promoted a healthy and competitive trucking industry. Instead, large numbers of established carriers have failed financially and many truck drivers have lost their jobs.[3] It was concern over these very problems which led Congress to limit the ICC's discretion over entry policy through the fitness requirement. The ICC has not respected Congress's directive. Accordingly, I would hold that the ICC failed to find that Stewco was a fit carrier as required by statute.

In addition to finding fitness, the ICC is required by section 10922(b)(2) to consider and, to the extent applicable, make findings on the transportation policy factors spelled out in 49 U.S.C. § 10101(a), quoted *supra,* at 1065–66 n. 10. While courts have made clear that the ICC need not discuss each of the policy factors listed in the statute in detail, *see, e.g., J.H. Rose Truck Line, Inc. v. ICC,* 683 F.2d 943, 951 (5th Cir.1982), it must provide the reviewing court with discernible reasons and essential basic find-

---

**3.** At least seventy-two trucking firms that were in business in 1978 went out of business in just one year, 1982; these firms represented sixteen percent of the industry's revenue. Another group of firms accounting for about twenty-

eight percent of the industry could be considered close to failure. As many as 85,000 to 107,000 workers were consequently laid off as of April, 1983. N.Y. Times, Dec. 13, 1983, at p. 1.

ings, *Central Transport, Inc. v. United States*, 694 F.2d 968, 971–72 (4th Cir.1982); *Star Delivery & Transfer v. United States*, 659 F.2d 81, 83 (7th Cir.1981); *International Detective Service, Inc. v. ICC*, 613 F.2d 1067, 1077 (D.C.Cir.1979); *Argo-Collier Truck Lines Corp. v. United States*, 611 F.2d 149, 153 (6th Cir.1979). The ICC has failed in this case to provide in its discretion sufficient basic findings to allow meaningful judicial review. This is not the first time the ICC has faced such a criticism. As the Fourth Circuit recently observed, "[t]he cases are legion in which the Commission has been criticized for making perfunctory, conclusory findings couched in the statutory language and for omitting its reasoning and findings on all but those ultimate facts." *Central Transport, Inc. v. United States, supra,* 694 F.2d at 972 (citations omitted).

The certificate application process is useless unless the Commission relates the basic facts of the case to the transportation policy articulated in the statute. For example, the ICC's failure to require an adequate showing of fitness seriously impairs the Commission's ability to consider the transportation policy factors of section 10101(a). Without financial information, the ICC is in no position to consider how Stewco's entry will affect economic conditions of the relevant sector of the industry, the possibilities of unfair or destructive competitive practices, or opportunities for adequate profits and fair wages and working conditions—explicit policy concerns articulated in the statute—and we certainly are in no position to review its decision. If Congress intends that anyone should be permitted to enter the trucking business, it should say so and eliminate the ICC permitting function and judicial reviewing function. Until it does so, I for one will continue to refuse to rubber-stamp agency actions based on theory rather than fact.

DECISION AFFIRMED.

