# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3798

_____

| | | |
|---|---|---|
| William K. King, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | On Petition for Review of an |
| | * | Order of the National |
| National Transportation Safety | * | Transportation Safety Board. |
| Board; Marion C. Blakey, | * | |
| Administrator, Federal Aviation | * | |
| Administration, | * | |
| | * | |
| Respondents. | * | |

_____

Submitted: November 17, 2003
Filed: April 1, 2004

_____

Before MURPHY, LAY, and FAGG, Circuit Judges.

_____

MURPHY, Circuit Judge.

Petitioner William King, an aircraft mechanic for Northwest Airlines, was randomly selected for a drug test and failed to provide a urine sample. The Administrator of the Federal Aviation Administration (FAA)[1] issued an emergency order revoking King's mechanic certificate, which was served on King and filed with

_____

[1]For ease of reference we generally refer to the FAA even though the Administrator acts as its representative.

the National Transportation Safety Board to initiate proceedings for permanent revocation. King filed an answer and appealed the revocation order to the Board. After a hearing, an administrative law judge (ALJ) ordered that the revocation order be dismissed. The FAA appealed, and the Board reinstated the revocation. King now petitions this court for review of the Board's order.

I.

A.

The federal agency respondents to King's petition administer safety regulations governing the aviation industry. The FAA is the primary administrative agency involved in aviation safety. It promulgates federal aviation regulations in accordance with the Administrative Procedure Act and enforces those regulations. The Board is an independent agency which also has responsibilities for aviation safety, including investigating accidents, making safety recommendations to the Secretary of Transportation, and reviewing FAA enforcement orders. See 49 U.S.C. §§ 1131, 1133 (2004). It is the FAA which establishes and enforces certificate regulations, and the Board decides appeals from FAA orders.

The statutory mandate of the FAA includes "assigning, maintaining, and enhancing safety and security as the highest priorities in air commerce." 49 U.S.C. § 40101(d) (2004). In carrying out that mandate the FAA has authority to promulgate legislative rules that carry the force of law, see Joseph v. United States Civil Serv. Comm'n, 554 F.2d 1140, 1154 n.26 (D.C. Cir. 1977), and to interpret and explain existing rules and regulations. See 5 U.S.C. §§ 552(a)(1)(D) and 553(b)(3)(A) (2004). In 1988 the FAA promulgated a rule initiating antidrug programs, including drug testing, for aviation personnel in safety sensitive positions. The FAA certifies aircraft mechanics, and it pursues enforcement actions related to certificates when the Administrator determines that air transportation safety and the public interest require action. See 49 C.F.R. § 13.19(b) (2004).

The Board decides appeals from FAA certificate actions and serves a function similar to that of a reviewing court. See Hinson v. NTSB, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995). The Board's Rules of Practice in Air Safety Proceedings govern these appeals. See 49 C.F.R. § 821.1-.64 (2004). An ALJ initially hears the matter and then issues a decision affirming, amending, modifying, or reversing the FAA order. See 49 U.S.C. § 44709(d)(1) (2004). A party may appeal the ALJ's decision to the Board, which can make new findings and issue new orders, affirm or reverse the decision, or remand the case. See 49 C.F.R. § 821.49(b) (2004). A party dissatisfied with the Board's decision may petition for review by a federal court of appeals. See 49 U.S.C. § 44709(f) (2004). The Board is not a party in interest in federal court proceedings and does not typically participate in them. See 49 C.F.R. § 821.64(a) (2004).

B.

Prior to May 2002, William King had worked as a Northwest Airlines aircraft mechanic for fourteen years. He held FAA Mechanic Certificate No. 267713773 and had never been disciplined, involved in an aviation incident, or tested positive for drugs. At 3:30 p.m. on May 16, 2002, he was notified of his random selection for a drug test that day.

There is no dispute that King arrived at the testing site on time at 4:45 p.m. He talked with a union representative who was already there and completed preliminary paperwork with the collector, Manuel Ortiz. Ortiz is a breath alcohol technician and drug screener for Consolidated Medical Services in Bloomington, Minnesota, who had at that time conducted over one thousand drug tests. Ortiz verified King's identity, explained the basic collection procedures, and directed King to empty his pockets to ensure that nothing was present that could adulterate a specimen. Ortiz then completed the custody and control form, instructed King to wash and dry his hands prior to providing a urine specimen, opened the collection kit, and secured the

testing site. The collector statement prepared by Ortiz stated that King's collection process was started without delay.

The parties dispute the time at which King made his first attempt to provide a specimen. That time is significant because an individual is given three hours to provide a specimen, measured from the time of an initial unsuccessful attempt. King's answer to the FAA's complaint contained an admission that his first attempt to urinate occurred at 4:50 p.m. Since his final failed attempt occurred at 7:52 p.m., his admission established that he had been given a full three hours for the test. King was allowed to amend his answer at the hearing before the ALJ, however, and he testified there that his first failed attempt occurred between 5:15 and 5:20 p.m. This testimony conflicted with the collector statement and Ortiz's testimony, both of which stated that his first attempt was at 4:50 p.m.

After King returned without a specimen, Ortiz told him to drink water and pointed out a water fountain. When King failed on his second attempt at about 6:10 p.m., Ortiz again urged him to drink water but the parties dispute whether he mentioned 40 ounces. Ortiz testified that he urged King to drink up to 40 ounces of water, but King testified that he did not; the ALJ found King's testimony credible. There is no dispute that King had unimpeded access to the fountain, and he testified that he used it four or five times and also consumed a 12 ounce soda, for his estimated total consumption of 20 to 27 ounces. King's further attempts to provide a urine specimen at 6:45 p.m. and at 7:52 p.m. were unsuccessful. Ortiz calculated that King had had a full three hours for the test and terminated the collection process at this point.

A representative of the Aircraft Mechanics Fraternal Association (AMFA) was present throughout the entire process: Paul Olson was there when King arrived, and Joseph Wagner relieved him after King's first failed attempt. Neither representative raised any challenge to the collection process, and both later testified at the hearing.

Olson, who had been present at hundreds of drug tests, testified "I didn't see anything wrong." Wagner testified that Ortiz was "the most intelligent of the testers that I have seen" but that he had not heard him advise King to drink 40 ounces. Wagner himself urged King to drink after his second unsuccessful attempt and later "urged him to drink a lot of water because the clock was ticking." At 6:45 p.m. Wagner told King to "drink water just to the point of being sick."

Just after 8 p.m. Ortiz called Timothy Bishop, Northwest's Drug and Alcohol Program Manager and Designated Employer Representative, to report on the test. Bishop questioned Ortiz about whether King had been provided access to water, whether he had been given three hours to provide a urine specimen, and whether he had been told that he could drink up to 40 ounces of fluid. Bishop testified that Ortiz had answered affirmatively. Bishop also testified that the drug testing site had undergone an FAA inspection in March 2002 and that he had confirmed with Ortiz that the regulations and Northwest Airlines policy statement were still posted at the collection site. Then Bishop spoke directly with King to confirm that he had not provided a sample. Then he asked King, "Are you sure you don't have to go?" King said "no," and Bishop told him that a medical evaluation would therefore be required to determine whether there was a medical reason for his failure to provide a specimen. He also explained that failure to provide a specimen could be deemed a refusal to test and result in King's discharge.

On the following day King reported for a "shy bladder" physical examination which includes a medical history, a brief physical exam, and laboratory tests to assess kidney function. The examining physician and medical review officer found no medical condition that would preclude King from providing a urine specimen. Failure to provide a sufficient amount of urine without an adequate medical explanation for the failure is considered a refusal to test. See 49 C.F.R. § 40.191(a)(5) (2004). Refusal to test is grounds for revocation of a mechanic certificate. See 14 C.F.R. § 65.23(b) (2004).

As a result of King's failure to provide a sample, Northwest Airlines terminated his employment and the FAA Administrator issued an emergency order on July 18, 2002 revoking his mechanic certificate. On July 25 King filed a notice of appeal, and on July 26 the FAA filed the emergency order as its complaint before the Board seeking permanent revocation of King's certificate. King filed an answer on July 30 in which he admitted paragraph 6(b) of the complaint which alleged that he had made his first attempt to urinate at 4:50 p.m.

At the hearing before the ALJ on August 22, 2002, King asked to amend his answer to change his admission that his first attempt had been at 4:50 p.m. to a denial. The ALJ permitted the amendment over the FAA's objection, and King then testified that his first attempt had been at 5:15 or 5:20 p.m. After hearing all the evidence, the ALJ found that King had not been given a full three hours to provide a urine sample, that he had not been advised to drink 40 ounces of water, and that the collector had not monitored and measured King's consumption of fluids. The ALJ concluded that the FAA regulations had not been followed and dismissed the order of revocation.

The FAA appealed to the Board, and it reversed the ALJ on legal grounds, affirming the order of revocation of King's mechanic certificate. The Board held that the ALJ had erred by allowing an amendment at the hearing without a showing of good cause and by misinterpreting the regulation requiring the collector to urge water consumption when an individual has difficulty in producing a sample. King then petitioned this court for review.

II.

In his petition King argues that the Board erred by reversing the ALJ's decision to allow his amendment, by not considering evidence that he offered after his answer was amended, and by accepting results of an inadequate medical examination. He contends that the Board's interpretation of the regulation dealing with the collector's

-6-

duty to urge water consumption is inconsistent with the regulation's plain meaning and purpose and notes that the ALJ found his testimony credible.

The FAA responds that the Board correctly held that the ALJ erred by allowing King's amendment without a showing of good cause, in violation of the rules of practice, and by permitting King to testify contrary to his earlier admission which had established that he had been given the required three hours for the test. The FAA also urges that substantial evidence supports the Board's finding that King had no medical condition which precluded him from providing a urine specimen. Finally, the FAA asserts that the Board's interpretation of the regulation dealing with a collector's duty in respect to water consumption was not arbitrary, capricious, or an abuse of discretion and therefore is entitled to deference.

Although the Board generally defers to the credibility findings of an ALJ, Administrator v. Gusek, 1999 WL 64489, at *1 (N.T.S.B. Feb. 8, 1999), its review of the FAA's interpretation of relevant regulations has a different standard. When adjudicating aviation safety enforcement actions, the Board is bound by the FAA's interpretation of its regulations unless it is arbitrary, capricious, or otherwise not according to law. See FAA Civil Penalty Administrative Assessment Act of 1992, Pub. L. No. 102-345, 106 Stat. 923 (1992) (codified as amended at 49 U.S.C. §§ 44703, 44709, 46301(d) (2004)); see also Garvey v. NTSB, 190 F.3d 571, 576-77 (D.C. Cir. 1999) (Congress has "unambiguously directed the NTSB to defer to the FAA's interpretations of its own regulations").

Federal appellate courts also review the FAA's interpretations of its own aviation regulations with deference. See Garvey, 190 F.3d at 577. While courts may affirm, amend, modify, or set aside Board decisions when appropriate, see 49 U.S.C. §§ 1153(b)(3) and 46110(c) (2004), its decisions should be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A) (2004); Watkins v. NTSB, 178 F.3d 959, 961 (8th

Cir. 1999) (per curiam). Factual findings are reviewed to determine whether they are supported by substantial evidence in the record as a whole. See 5 U.S.C. § 706(2)(E) (2004); Watkins, 178 F.3d at 961. Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Erickson Transp. Corp. v. Interstate Commerce Comm'n, 728 F.2d 1057, 1062 (8th Cir. 1984) (citation omitted).

A.

FAA regulations provide that after an initial unsuccessful attempt to provide a specimen, an individual has three full hours to complete the test. See 49 C.F.R. §§ 40.193(b)(2) and (4) (2004). In his answer King agreed with the timeline stated in the complaint and did not raise any issue about the amount of time he had been given, but at the hearing before the ALJ he asked to amend his answer so he could argue he had not been given three full hours. Although the FAA objected on the basis of surprise, the ALJ granted the motion. This permitted King to testify that he made his first attempt some 25 minutes later than he had previously admitted. The Board ruled that the ALJ had erred by allowing the amendment in violation of its procedural rules which require a showing of good cause and that this had been unfair to the FAA.[2]

King argues that the Board violated its precedent by reversing the ALJ's decision on the amendment without evidence of prejudice, that the FAA had not phrased its objection at the hearing in terms of no good cause shown, and that the Board failed to consider all relevant evidence. The FAA responds that the last minute amendment to King's answer was prejudicial because the Administrator had relied on

---

[2]The Board's opinion and order stated: "The [FAA] Administrator, no less than any other party appearing before our law judges, is entitled to fair and unbiased treatment. We would admonish our judges to take pains to ensure that the due process rights of all parties are unerringly respected." Belger v. King, 2002 WL 31132999, at *2 n.6 (N.T.S.B. Sept. 25, 2002).

his admission of key facts in preparing her case. King's answer was filed on July 30 and he did not attempt to correct or amend it until the August 22, 2002 hearing, even though the parties had communicated and exchanged discovery in the interim. Since his admissions had established that he was given three full hours to provide a urine specimen, the FAA complains that the amendment put a presumptively resolved issue back into play without notice.

The Board concluded that the ALJ had abused his discretion by allowing King to change his answer at the hearing over the FAA's timely objection. The Board's rules of practice "expressly and unequivocally limit a law judge's discretion to permit an amendment to a pleading at the hearing to instances where good cause for the change has been shown." Belger v. King, 2002 WL 31132999, at *2 (N.T.S.B. Sept. 25, 2002) (citing 49 C.F.R. § 821.55(e)). The standard in emergency matters such as King's is not whether an amendment would prejudice the other party, but whether the amendment is supported by good cause. See 49 C.F.R. § 821.55(c) (2004) ("The law judge may permit or require a more definite statement or other amendment to any pleading at the hearing, upon good cause shown and upon just and reasonable terms."). See also Administrator v. Jones, 2001 WL 366429, at *2 (N.T.S.B. Apr. 6, 2001) ("Because any amendment that adds to a respondent's evidentiary burden in an emergency case could be said to be at least potentially prejudicial, given the exceptionally short discovery time available before a hearing must be held, our regulations . . . obligate a law judge to ensure good cause supports all such amendments."); Administrator v. Fuller, 2001 WL 366426, at *1 n.5 (N.T.S.B. Apr. 6, 2001) (ALJ did not abuse its discretion by rejecting amendment without cause).

The Board's practice rules require that a movant make a showing of good cause in order to amend a pleading at the time of the hearing. The rules "expressly and unequivocally" restrict the ALJ from granting a motion to amend in the absence of such a showing. The record does not show that King provided any reasons for his requested amendment and despite the FAA's timely objection, the ALJ made no

findings in support of his decision to permit it. King claims that he had discussions with the ALJ before the hearing in which he provided cause, but under its governing rules of practice the Board declined to consider any ex parte conversation that was not on the record. See 49 C.F.R. § 821.40 (2004) (testimony and exhibits together with papers, requests, and rulings constitute the exclusive record of the proceedings). King now argues that his purpose was to expedite the proceedings by his amendment, but a last minute change in position which surprises the other party and leads to the introduction of unexpected and potentially decisive evidence is unlikely to expedite the process in a fair way. Moreover, King gave no reason on the record for his untimely request, and the ALJ made no findings to support his ruling.

We conclude that the Board did not abuse its discretion or act arbitrarily in determining that the ALJ had erred by permitting an amendment at the hearing without a showing of good cause, in vacating the amendment to King's answer to paragraph 6(b) and striking his new evidence, and in reversing the finding that he had received less than three hours to provide a urine specimen.[3]

B.

King also challenges the Board's interpretation of the collector's obligation under 49 C.F.R. § 40.193(b)(2). That regulation provides that if an employee fails to provide sufficient urine, the collector "must . . . [u]rge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours or until the individual has provided a sufficient urine specimen, whichever occurs first."

---

[3]Because the Board did not act arbitrarily or capriciously in enforcing its practice rule, we need not discuss its findings that the ALJ had ignored some of the evidence and that consideration of all the evidence, even with King's new testimony, would have led to a finding that more than three hours elapsed between his first attempt and the final opportunity presented when Bishop asked if he was sure he couldn't provide a sample. King, 2002 WL 31132999, at *2 n.7.

Id.  Although there was conflicting evidence, the ALJ found that Ortiz had not explicitly mentioned 40 ounces to King.  The ALJ also found that Ortiz had not used a measuring device or watch to ensure that King's water consumption was evenly distributed over the three hours.

The Board reversed the ALJ's interpretation of the regulation as the judge recognized it might.[4]  The Board held that 49 C.F.R. § 40.193 does not provide that a test is not valid if the collector does not monitor or administer an employee's water consumption or urge that 40 ounces be consumed.  The Board explained:

> There is, however, no basis in the regulatory history for concluding that a test should be invalidated if the collector did not himself dispense to the respondent measured cups of water totaling 40 ounces, as the law judge suggests he needed to do, and there is no showing on this record that such a procedure is utilized by those performing drug testing for Northwest Airlines or anyone else.  Moreover, the regulatory history does not suggest that drinking that quantity of water would produce any specific amount of urine for a specimen.  Rather, it was selected essentially as a cap on the amount of water an individual should consume without raising concerns over water intoxication or dilution of a specimen.

King, 2002 WL 31132999, at *3 (emphasis added).  The Board concluded that Ortiz had satisfied the requirements of the regulation because it did not require him to measure out fluids over the period of the test and he had told King to drink water in order to overcome his difficulty in providing a urine specimen even if he did not mention 40 ounces.  The ALJ's contrary reading would require a more structured workplace testing process, said the Board, than "so far as this record shows, ever occurs."  Id.

---

[4]The ALJ commented during the hearing that, "Everybody here is going to have an interpretation of that regulation [49 C.F.R. § 40.193], and ultimately the safety board is going to decide whose interpretation is most accurate."

-11-

In his petition for review King contends that the Board's interpretation ignores the plain language of the regulation. Since the ALJ found that Ortiz never mentioned 40 ounces, King argues that the collector did not meet the requirements of the regulation. King also asserts that Ortiz failed to encourage him to drink until almost halfway through the collection period, thus failing to ensure a reasonable distribution of fluids. The FAA counters that the Board's interpretation of the regulation is entitled to deference. It argues that the regulatory history supports its position that the collector is not required to administer or monitor fluid consumption, that the ALJ's insistence that the collector use a measuring device and watch misapplied the regulation, and that 40 ounces was intended as a cap to prevent water intoxication and specimen dilution. It also contends there is substantial evidence in the record which was not considered by the ALJ, but which shows that Ortiz did urge King to drink up to 40 ounces.[5]

King has not cited any judicial or administrative precedent inconsistent with the Board's interpretation of this regulation,[6] and the Board's position has support in the regulatory history. According to the Department of Transportation, the purpose of the regulation is to allow an employee an enhanced opportunity to provide a sufficient specimen and to avoid an unnecessarily complicated collection process.

_____

[5]The FAA refers to Ortiz's testimony and his collector statement prepared within two weeks of the test, corroborated by Bishop's testimony and his contemporaneous memorandum of his talk with Ortiz confirming that the collector had urged 40 ounces of fluid.

[6]King cites only an arbitration decision dealing with a labor agreement which incorporated Department of Transportation drug testing regulations. See Davidson Transit Org., 117 Lab. Arb. Rep. (BNA) 1193 (Sept. 12, 2002). Although the arbitrators' interpretation of the regulation on water consumption was similar to the ALJ's, it is the FAA that has initial responsibility for interpreting and enforcing its regulation and the Board that is charged with adjudicating conflicts dealing with its interpretations. See 49 C.F.R. § 800.3(b) (2004).

See Procedures for Transportation Workplace Drug and Alcohol Testing Programs, 61 Fed. Reg. 37,693, at *37,696 (July 19, 1996) (final rule) (codified at 49 C.F.R. pt. 40).[7] The Department rejected a proposed schedule under which eight ounces of fluid would be consumed each half hour up to 40 ounces because it would have made the collection process too burdensome to administer. Id. Under the regulation as revised in 2000, the employee largely determines whether, when, and how much to drink in order to produce the required urine specimen within the given time period. The revision relaxed the collector's responsibilities from directing water consumption by the employee to urging it, compare 49 C.F.R. § 40.25(f) (1996) with 49 C.F.R. § 40.193 (2000), and no longer deemed it a refusal to test if an employee rejected fluids, thus placing responsibility on the employee to avail himself of fluids if needed to produce a specimen.

The ALJ's overly formalistic interpretation of the regulation would require the collector to use a measuring cup and stop watch without regard to the practical realities of workplace testing. Here, there was substantial evidence in the record for the Board's findings that King was made aware of the relationship between the consumption of liquids and the production of a urine sample and that his failure to do so was not attributable to the collector's administration of the test.

We conclude that the Board's interpretation of 49 C.F.R. § 40.193 is reasonable, and neither arbitrary, capricious, nor an abuse of its discretion. Watkins, 178 F.3d at 961. Because the ALJ applied a contrary interpretation in finding that

---

[7]In revising the regulations, the Department of Transportation reviewed survey data from 18,800 drug tests conducted over a two week period at nearly 500 collection sites. The average time for an employee to complete a urine test, from the paperwork stage until a specimen was provided, was about 12.4 minutes. The test subjects produced an adequate specimen in 98.8% of the collections. Id. 61 Fed. Reg. at *37,695.

King's drug test had not been administered properly, his decision to overturn the FAA's revocation order cannot stand.[8]

## III.

The revocation of a mechanic certificate may seem a harsh sanction without proof of illicit drug use, but the drug testing regulations embody a judgment that an unexplained failure to provide a specimen for testing may well reflect an effort to evade a positive drug test result, and thus revocation is warranted. See Administrator v. Krumpter, 1998 WL 801755, at *3 (N.T.S.B. Nov. 13, 1998); Administrator v. Pittman, 1998 WL 400022, at *2 n.7 (N.T.S.B. June 29, 1998) (employees could routinely escape accountability for alcohol or drug misuse by refusing to cooperate unless revocation were the predictable consequence). Random drug testing in the workplace is the most reliable method of discovering whether an employee is working under the influence of a forbidden substance, and the testing program was put in place in the interest of air safety. See Administrator v. Wright, 2001 WL 540575, at *2 (N.T.S.B. May 17, 2001); Anti-Drug Program for Personnel Engaged in Specified Aviation Activities, 53 Fed. Reg. 47,024 (Nov. 21, 1988) (final rule) (codified at 121 C.F.R. pts. 61, 63, 65, 121, and 135).

The Board has "a wide range of discretion in imposing sanctions," Balestra v. Busey, 923 F.2d 120, 122-23 (8th Cir. 1991) (citing Erickson v. NTSB, 758 F.2d 285, 290 (8th Cir. 1985)), and the record does not reflect that it abused its discretion in upholding the revocation of King's mechanic certificate. Neither did it abuse its discretion by holding that the ALJ erred in allowing an amendment at the hearing

---

[8]King also argues that his medical examination was flawed by an underlying assumption that he had been urged to drink 40 ounces of fluid over three hours. There is nothing in the record to support this argument, however, or to cast doubt on the examining physician's finding that King had no medical condition precluding him from providing the required urine sample.

without good cause shown.  The Board's interpretation of the regulation relating to water consumption was not arbitrary or capricious, and there is substantial evidence in the record to support its findings that King's failure to provide a urine specimen was not due to a medical problem and that it amounted to a refusal to test.

Accordingly, we affirm the order of the Board.

_____